No. 19,275.

ROBERT WOOLVERTON, ET AL. *v.* CITY AND COUNTY OF DENVER.

(361 P. [2d] 982)

Decided April 24, 1961. Rehearing denied June 5, 1961.

Messrs. LAW, NAGEL and CLARK, for plaintiffs in error.

Mr. DONALD E. KELLEY, Mr. JAMES P. McGRUDER, for defendant in error.

*En Banc.*

MR. JUSTICE DOYLE delivered the opinion of the Court.

PLAINTIFFS in error will be referred to as defendants as they appeared in the superior court where they were prosecuted by the City and County of Denver for gambling. On August 5, 1959, on trial to a jury, defendants were found guilty and sentenced to 90 days in jail and a $300.00 fine. They were charged with violating Sec. 821.1 Denver, Colo. Rev. Municipal Code (1950), which provides in part:

"821.1. *Maintaining Gambling Devices, Playing Gambling Devices, Betting on Games Prohibited.* It shall be unlawful for any person to * * * play for money or any valuable thing at any game with cards, dice, or with any article, device, or thing whatever, which may be used for the purpose of playing or betting upon, or winning or losing money or other property; or to bet on any game others may be playing."

The evidence discloses that defendants engaged the complaining witnesses in a dice game which commenced in Jefferson County on June 26, 1958. The same parties engaged in a poker game in Jefferson County on June 27, 1958, and that evening continued to gamble at an address in Denver. It was this latter transaction which formed the basis for a prosecution in the municipal court of Denver.

Upon conviction in that court appeal was taken to the superior court. Important in determination of the con-

troversy were two statutes of the State of Colorado. C.R.S. '53, 40-10-10 provides a penalty for gambling. This statute declares:

"40-10-10. Wagering upon games — penalty. — If any person shall play at any game whatsoever, for any sum of money or other property of value, or shall make any bet or wager for any sum of money or other property of value, upon the result of such game, every such person, on conviction thereof, shall be fined in any sum not less than fifty dollars nor more than one hundred and fifty dollars."

Another section has authorized municipalities to enact policing regulations in various fields among which is that presently before us. 139-32-1 (52) empowers the governing bodies of both cities and towns:

"To suppress bawdy and disorderly houses, houses of ill fame or assignation, within the limits of the city or town, or within three miles beyond, except where the boundaries of two cities or towns adjoin the outer boundaries of the city or town; *and also suppress gaming and gambling houses, lotteries and fraudulent devices and practices, for the purposes of gaining or obtaining money or property,* and to prohibit the sale or exhibition of obscene or immoral publications, prints, pictures or illustrations."

The underscored portion pertains to gaming and gambling and is here pertinent.

The main contention advanced by defendants is that the City lacked legislative jurisdiction to enact the above quoted ordinance and was powerless to prosecute under it. They summarize their arguments by asserting:

"* * * The regulation of gambling being a matter of state-wide concern, the subject ordinance is in excess of the powers and jurisdiction of the City and County of Denver, and which power and jurisdiction to regulate has been withheld by statute to the people of the State of Colorado and not to the municipalities of the State."

## I.

The defendants' argument is a derivation and extension of the principles embodied in *Canon City v. Merris,* 137 Colo. 169, 323 P. (2d) 614, wherein it was held that a home rule municipality lacked power to enact legislation prohibiting driving a motor vehicle while under the influence of intoxicating liquor. The gist of the Court's decision is found in these words:

"What is local and municipal is frequently difficult to determine. We hold that the operation of a vehicle by one who is under the influence of intoxicating liquor is a matter of state-wide concern. Ordinarily, regulation of traffic is a local and municipal matter."

In the course of the opinion, Article XX, sec. 6 h, was commented upon as follows:

" 'Supersede' is defined 'as meaning to supplant * * *; to replace, displace, or set aside and put another in the place of; to take the place of by reason of superior worth, appropriateness, efficiency or right.' 83 C.J.S., p. 889. In the company of words, appearing in Article XX, Section 6, the term 'supersede' means that the law of the state is displaced on a local and municipal matter where there is an ordinance put in its place. Where, however, the matter is of state-wide concern, supersession does not take place. *Application of state law or municipal ordinance, whichever pertains, is mutually exclusive.*" (Emphasis supplied.)

The underscored sentence in the above quotation, which was given by way of dictum, carries with it the following implied corrollary rules:

1. Article XX, sec. 6 of the Constitution of Colorado authorizing home rule municipalities, not only serves as a grant of power to such municipalities but also to strictly limit the powers of such municipalities. Its legislative powers are limited to matters strictly and exclusively local in nature, thus rendering abortive any attempt of a city to legislate on a subject having a semblance of general or state-wide character.

2. That the state is limited in *its* authority to matters having a state-wide or general nature so that its efforts to legislate on matters having local quality are also void.

If these definitions were to be carried to an extreme conclusion, it would become necessary to void the ordinance now before us, since it has both local and state-wide aspects. The mutual exclusion concept would create two distinct spheres of exclusive legislative jurisdiction and two distinct bodies of law; the one local, the other state-wide. Since neither could exercise power in the area belonging to the other, it would then become necessary for each subject to be treated and classified by this Court as general or local, to the end that the legislative jurisdiction of the state and that of the local authority could be properly circumscribed.

 The first inquiry is whether such a rigid and narrow approach is required by the language of the constitution. Article XX, sec. 6 h, does indeed grant to home rule cities exclusive jurisdiction over subjects local and municipal. The municipality, by passage of an ordinance dealing with a strictly local subject, supersedes an existing statute on the same subject. *Denver v. Henry,* 95 Colo. 582, 38 P. (2d) 895. By the same token, if the subject matter is inherently and entirely a matter of state sovereignty, the state, by asserting its authority, effectively thwarts any attempted exercise by the city of legislative jurisdiction in the same field. *Denver v. Tihen,* 77 Colo. 212, 235 Pac. 777. It follows that the doctrine of mutual exclusion pronounced in the *Merris* case has validity as between the home rule city and the state where the subject matter is unquestionably and wholly local or is strictly state-wide. For example, it could not be contended that the home rule municipality could, even with the consent of the state, define felonies or that the state could assume authority of traffic regulation within the home rule city, *Denver v. Henry,* supra.

## II.

Accepting the foregoing premise that there are black

and white areas of state and local mutually exclusive legislative jurisdiction, the question remains whether all subjects must be so categorized. Is it necessary that each and every legislative subject be classified and so fitted into either a state-wide or local and municipal *category,* with the result that either the home rule city or the state, but not both, is empowered to exercise exclusive authority with respect thereto? We are of the opinion that such approach is arbitrary, highly impractical and not demanded by either the constitution or by our decisions.

■ First, Article XX, sec. 6, does not impose any such *strict* requirement. It recognizes that a state statute on a subject over which the city has exclusive power — that which is local and municipal — continues in force *until* it is superseded by a local ordinance. A pure application of the mutual exclusion idea would preclude any legislative action in a field reserved for local regulation. *Denver v. Henry,* supra, and see also *People ex rel. Stokes v. Newton,* 106 Colo. 61, 101 P. (2d) 21, which recognized the authority of the state to create an independent legal entity to deal with public housing notwithstanding that public housing was there conceded to be "* * * a matter of local concern." It was there held that since Denver had not exercised the authority to legislate by amending its charter, the state law was controlling.

■ The constitution, furthermore, does not expressly deal with those subjects having both state-wide and municipal problems, thus leaving these matters to legislative implementation. Thus a strict and unflexible application of the mutual exclusion theory to a municipal ordinance is not required by either the express or implied provisions of the constitution.

*Secondly,* pre-*Merris* decisions of this Court have long recognized the existence of subjects neither exclusively state-wide nor exclusively local, but having the attributes of both. Public health is of such a nature.

See *Spears Hospital v. State Board of Health,* 122 Colo. 147, 220 P. (2d) 872, where it was recognized that there are facets of public health which are local while others are state-wide, and that the licensing of hospitals is of the latter type. The language there used by the Court clearly recognizes the dual interest and responsibility of the state and locality in this field and the impossibility of easy categorization. It was there said:

"Under the provisions of Article XX of the Constitution and of its charter, the city acquired exclusive control of local and municipal affairs, but it remained 'as much amendable to state control in all matters of a public, as distinguished from matters of a local, character, as are other municipalities.' *People ex rel. v. McNichols,* 91 Colo. 141, 13 P. (2d) 266. *Health is a matter which may be either of general or of municipal concern.* Infectious diseases in particular recognize no city lines, and under its police power the state retains the right to regulate such matters affecting public health as are of general concern, including the right to license and regulate hospitals wherever situated. At the same time, congested living conditions within cities may produce health problems justifying further regulation than those deemed necessary by the legislature, and as to such matters cities may possess the police power of further regulation within their limits. We are not here confronted with any conflicting mandate of statute and ordinance or with challenge to any particular statutory command, but only with challenge to the broad right of the legislature to provide for the licensing of hospitals, within the limits of home-rule cities, in the interest of the general health. That challenge cannot be sustained." (Emphasis supplied.)

Clear recognition is thus given to the concept that in a field of both local and state interest the municipality has not a superseding authority as contemplated by Article XX, sec. 6, supra, but an actual supplemental

authority to deal with the added problems arising from municipal congestion.

*Denver v. Tihen,* supra, is generally regarded definitive of the extent and operation of Article XX, the home rule amendment. There the city of Denver, acting pursuant to authority granted by its charter, undertook to levy a tax against cemetery property. Denver's position was that a state statute exempting cemeteries was superseded by the city's exercise of authority to levy, assess and collect taxes, without recognizing any such exemption. The Court speaking through Mr. Justice Campbell recognized the local nature of the levy and assessment of ad valorem taxes but held that it did not supersede the state authority to declare exemptions. It was there said:

"\* \* \* That public policy of the state applies to every portion of the state. It is just as applicable to the home rule cities now as it was and is to municipalities organized under general statutes."

In concluding that the subject was not purely local, the Court said:

"\* \* \* Applying the principle laid down in these decisions, we say that while the matter of the taxation and *assessment of cemeteries in this state, not organized or maintained for private or corporate profit, is, in a sense, local to every city and county in the state, yet in the larger and fuller sense, considering the general sentiment of all civilized people that ground set apart for the burial place of the dead is sacred, it is a matter of state-wide importance and of governmental import, and not merely of local or municipal concern.* Certainly in the absence of a specific contrary provision on the subject, this court should not hold that the people of the state did nor would consent that cemeteries in any part of the state should be subject to taxation or assessment."

We draw from *Denver v. Tihen,* supra, that although the locality may possess a general power, nevertheless some aspect or part of it retains its identity as general

and must give way to superior and dominant state-wide policy. An additional lesson to be derived from it is that the state can validly consent to local exercise of authority even though the subject is predominately state-wide.

*Provident Loan Society v. City and County of Denver,* 64 Colo. 400, 172 Pac. 10, is even clearer in its recognition that dual non-conflicting legislative authority is valid in areas where both the city and the state have interests. The legislative subject in that case was that of licensing and regulating pawnbrokers. An ordinance was upheld despite the fact the state had legislated on the subject. There, too, the supplemental authority of the city to act in dealing with its special problems was the determining factor. The Court's reasoning appears in the following language:

"It is well settled that the mere fact that the state, in the exercise of the police power, has made certain regulations does not, however, prohibit a municipality from exacting additional requirements. So long as there is no conflict between the two and the requirements of the municipal by-law are not in themselves pernicious, as being unreasonable or discriminatory, both will stand. 19 R.C.L. 804, Sec. 110."

And concluded at p. 405:

"The city has the power to legislate upon local and municipal matters. If, as contended by plaintiff in error, the business of pawnbroking is a matter of state-wide interest, this fact does not prevent such business from being also a matter of municipal interest. The preservation of the health, safety, welfare and comfort of dwellers in urban centers of population requires the enforcement of very different and usually much more stringent police regulations in such districts than are necessary in a state taken as a whole."

See also *Bay v. City and County of Denver,* 109 Colo. 74, 121 P. (2d) 886, where the validity of local legislation regulating interest rates on small loans which conflicted

with legislation enacted by the state was considered. It was held, of course, that in such circumstances the state statute must prevail. At the same time it was pointed out that conflict is the only reason for voiding such an ordinance. If the two legislative acts are consistent they can exist side by side. The language in the opinion of Mr. Justice Knous, which succinctly expounds this proposition, is quoted:

"Both parties agree, as is a fundamental principle, that an ordinance which is in conflict with a state law of general character and state-wide application is invalid. Glendinning v. Denver, 50 Colo. 240, 114 Pac. 652. See, also 37 Am. Jur., p. 787, §165; 43 C.J. 215, §219; McQuillin on Municipal Corporation (2d ed.) vol. 2, p. 697, §683. As the legal basis for its position the city cites that, in considering the application of this fundamental principle, the courts many times have held the mere fact that the state in the exercise of its police power has made certain regulations, does not prohibit the municipality from exacting additional requirements (see Provident Loan Society v. Denver, 64 Colo. 400, 172 Pac. 10; 37 Am. Jur. 790, §165; 43 C.J. 219, 220, §220), and asserts that the reduced rates to be charged on small loans in Denver under the promulgations of the ordinance are no more than additional requirements to the coexisting prohibitions of the statute. * * *"

██ If an ordinance and a statute which do not conflict can coexist, it would follow that a city, acting with the express consent of the state, can legislate on a subject within the legitimate sphere of both its interest and that of the state. Clear recognition of this consent principle is apparent in *McCormick v. City of Montrose,* 105 Colo. 493, 99 P. (2d) 969, which upheld a local ordinance declaring house to house non-consentual peddling a nuisance (involving Real Silk Hosiery salesman). A state statute authorized towns and cities to declare nuisances and the question was whether the ordinance was within the terms of a legislative grant to the city. The

Court decided that the city had the power to punish the proscribed conduct irrespective of whether it was properly classified as a nuisance. The pertinent language in the opinion of Mr. Justice Young recognized that a city may exercise legislative authority, even assuming that the subject had a state-wide aspect, at least until such time as the state preempts the field by expressly assertting its right to legislate to the exclusion of the home rule city. The Court said:

"* * * The Twentieth Amendment to the Constitution gives home rule cities the right to exercise police power as to local matters, possibly subject to the limitation that they may not exercise police power in such manner as to interfere with the state's exercise of its police power where it has elected to deal with the same subject matter. Denver v. Tihen, 77 Colo. 212, 235 Pac. 777. But no conflict is here involved, and we need not and do not concern ourselves either with the existence of a limitation or its extent, if there is one. Whether there shall or shall not be soliciting in or upon private residences within the city, at least until the state has seen fit to exercise its police powers with reference to it, is a matter of local concern only. If the city has the power to penalize the conduct declared by the ordinance to be a nuisance, we think that it is immaterial that it provided that such conduct shall first be given the name of nuisance, which defendant contends is not, and which may not be in fact, a fitting name. The real question is whether the city has the power to punish the proscribed conduct not whether it has the right to name it."

It seems clear then that the cases have not recognized exclusive spheres of activity whereby the authority of the state and the city must be meticulously separated and the respective powers so isolated as to involve the severe penalty of death to any ordinance which strays onto state soil. On the contrary, the Courts have sensibly recognized the practical impossibility of such divisions.

Third, the post-*Merris* cases have recognized that

sometimes both the state and the city has a legitimate interest in the subject justifying legislation on the part of both. See, for example, *City of Golden v. Ford*, 141 Colo. 472, 348 P. (2d) 951, holding that the statutory town of Golden could not enact an ordinance against picketing because the state had asserted its power to legislate covering the entire field of labor disputes. Speaking through Mr. Justice Sutton, the Court said:

"* * * The ordinance in question, insofar as it deals with the conduct of parties to a 'labor dispute' is clearly an attempt to cover in a different and sometimes conflicting manner the same field as is covered by the 'Labor Peace Act.' As such, it must be held without force or effect."

In *Sierota v. Scott*, 143 Colo. 248, 352 P. (2d) 671, the Court construed the terms used in granting authority to a municipality in determining whether it was acting within the power granted, and concluded that the ordinance there in question was outside the power granted by the General Assembly.

*City of Aurora v. Mitchell*, 144 Colo. 526, 357 P. (2d) 923, was also a preemption case. It recognized that a statutory city is entirely subject to statutory authorization. *Davis v. City and County of Denver*, 140 Colo. 30, 342 P. (2d) 674, considers in detail the validity of the consent principle now under discussion and declares that a state may grant legislative authority to a home rule municipality on a subject such as that now before us which has both general and local attributes.

### III.

Proceeding on the premise that some subjects are neither strictly local nor exclusively state-wide and that the mutual exclusion doctrine is not applicable to these intermediate subjects, we turn to the next inquiry, i.e., whether gambling is to be fitted into one of the extreme categories or is a problem having both general *and* local interest.

Historically, gambling was not regarded as a matter

subject exclusively to state regulation. See 4 Bacon's *Abridgement* 450, where the history of gaming is outlined. See also Stuttfield, *Laws on Betting* (1899) 149. The Bacon text tells us that under the common law, in England at least, gambling was not always considered a crime. The following quotes demonstrate that gambling was certainly not a crime *malum in se:*

"It seems that by the common law, the playing at cards, dice &c., when practiced innocently and as a recreation, the better to fit a person for business, is not at all unlawful, nor punishable as any offence whatsoever.

\* \* \*

"And although gaming, in the manner as has been said, may be lawful, yet if a person be guilty of cheating, as by playing with false cards, dice, &c., he may be indicted for it at common law, and confined and imprisoned according to the circumstances of the case and heinousness of the offence.

\* \* \*

"Also, from the destructive and pernicious consequences which must necessarily attend excessive gaming, both the courts of law and equity have shown their abhorrence of it. Hence in a case where A came to the house of B and won of him 900 £. which he carried away, and afterward won 1500 £. more, which he had in his possession, but which B and his servants took from him by violence, upon which A brought an action of trespass, the Court of Chancery granted an injunction."

The prohibition or regulation of gambling was not considered the exclusive prerogative of the sovereign. Only the incidental consequences were regarded as anti-social and subject to prohibition, and the extent of common law prohibitions and sanctions is now uncertain. Therefore it differs from offences such as larceny, the prohibition of which was the exclusive province of the sovereign. Cf., the concurring opinion in *Gazotti v. Denver,* 143 Colo. 311, 352 P. (2d) 963. In the United States it appears from an examination of the texts that gambling

has been regulated by both the municipalities and the states. See Rhyne, *Municipal Law,* 621, 622 and 24 Am. Jr., *Gaming and Prize Contests,* sec. 6 at 402. An observation appears in *Provident Loan Society v. Denver,* supra, showing the attitude of the Court toward the problem in the year 1918. The Court took it for granted that an ordinance such as that before us was feasible when it said:

"Thus, a municipal ordinance making it an offense to permit gaming in the place or house of any person is not invalid because the state had enacted a statute which prohibited such acts in public places. Greenville v. Kemmis, 58 S.C. 427, 36 S.E. 727, 50 L.R.A. 725. An ordinance declaring it unlawful for an automobile to be driven on public streets at a greater rate of speed than six miles per hour, was held not to be in conflict with a statute prohibiting the driving of automobiles 'within the thickly settled or business portion of any city at a greater speed than twelve miles per hour.' * * *"

The *Greenville* case, cited with approval above, held that a municipality could prohibit gambling even though the state had defined and prohibited the offense. It was said that the city was authorized by virtue of a charter provision allowing the city to pass ordinances necessary for securing the peace and good government of the city.

That the State of Colorado has depended upon the cities to adopt ordinances prohibiting and punishing gambling is disclosed not only by sec. 139-32-1 (52) but also by the fact that the state statute on this subject prescribes highly inadequate remedies. The minimum fine is $50.00, and the maximum $150.00. No jail sentences are prescribed. No doubt the professional gambler would submit without complaint to the payment of such a fine on a regular basis, regarding it as nothing more than a modest license fee, and would not be deterred by such penalties. This manifests clearly that the state has asserted no intent to preempt or monopolize this field.

Although the precise question before us has not

been heretofore decided, our recent decisions do not disclose a tendency to treat it as one exclusively statewide or general. In *Zerobnick v. Denver,* 139 Colo. 139, 337 P. (2d) 11, the Court reviewed a conviction for gambling arising under a municipal ordinance and failed even to comment on its validity from the standpoint now being considered. So also in *McIntosh v. City and County of Denver,* 144 Colo. 59, 355 P. (2d) 97, involving a municipal ordinance relating to prostitution, the Court affirmed a conviction thereunder and again failed to comment on whether legislative jurisdiction to prohibit and punish prostitution (which for the present purpose is substantially similar to gambling) resided in the state or in the municipality. It must be conceded that gambling is a matter in which the state as a whole has a strong interest in regulating and perhaps prohibiting. On the other hand, it is idle to argue that such problems do not arise in the cities as a result of urban congestion, justifying local prohibition and penalties. Recognizing this dual interest, we are persuaded that the subject of gambling is not such that it must be categorized as either strictly local *or* strictly state-wide in nature.

IV.

The final question is whether the exercise of municipal jurisdiction, under the present circumstances, is valid. We have concluded that the subject is not one on which mutual exclusion operates, and further that the municipality has a sufficient interest to exercise jurisdiction in the absence at least of some state prohibition. Since the state has not asserted its authority so as to exclude the city as in *Denver v. Tihen,* supra, and has in fact manifested consent to the adoption of such an ordinance by 139-32-1 (52), it follows that the ordinance before us is a valid exercise of municipal authority.

It might be argued that the consent statute cited above applies to non-home rule towns and cities only. The cases do not hold to such a distinction. See *McCormick v. City of Montrose,* supra, wherein a home rule

city adopted a prohibitory ordinance based upon a consent statute. Although the state statute there was less specific than here, the tenor of the *McCormick* case is approval of such authority. To hold that a statutory city has more power than a home rule city would be anomalous indeed. Yet a determination that gambling is statewide and that a home rule city is powerless to act in that field, at once recognizes the superiority of the statutory city over a charter city organized under the XXth Amendment.

## V.

In holding that in limited circumstances the city can legislate on a subject also within the power of the state, in no way compromises the salutary holdings of the *Merris* case requiring criminal law safeguards to be observed in municipal prosecutions where counterpart statutes declare crimes. The mere fact that the city has the power to legislate does not mean that there could ever be recognition of dual sovereignty or double prosecutions. The Twentieth Amendment decisions such as in *Durango v. Reinsberg*, 16 Colo. 327, 26 Pac. 820; *Huffsmith v. People*, 8 Colo. 175, 6 Pac. 157 and *Hughes v. People*, 8 Colo. 536, 9 Pac. 50, are not hereby resurrected. This holding clearly recognizes, just as the General Assembly has recognized, that it is more practical for the city to prohibit and punish gambling within its borders than for the state to do so, and that those ordinances adopted with the consent or approval of the state are valid. The present determination that there is nothing basically invalid about legislation on the same subject, by both a home rule city and the state, does not effect the prohibition against double prosecution, nor does it undermine any basic safeguards.

It follows that sec. 821.1 of Denver, Colo. Rev. Municipal Code (1950), defining and punishing gambling, is a valid exercise of the municipal legislative authority, and that Denver was engaged in the valid legal exercise of its power and authority in prosecuting defendants pur-

suant to this ordinance.

Other errors urged by defendants, we consider unnecessary to discuss. A review of the record persuades us that defendants were afforded a fair and impartial trial and that no prejudicial error was committed.

The judgment is affirmed.

Mr. Justice Moore concurs in the result.

Mr. Justice Frantz and Mr. Chief Justice Hall dissent.

Mr. Justice Moore specially concurring in the result.

Plaintiffs in error were convicted of violating an ordinance of the City and County of Denver which prohibited gambling. The question for determination presented by the record is whether the prohibition of gambling is a matter which is "local and municipal" within the meaning of Article XX, section 6 of the Constitution of Colorado. In that section of the constitution it is provided that a home rule city may adopt a charter "which shall be its organic law and extend to all its local and municipal matters." It is further provided that, "Such charter and the ordinances made pursuant thereto in such matters shall supersede within the territorial limits and other jurisdiction of said city or town any law of the state in conflict therewith." Home rule cities have been granted "* * * all other powers necessary, requisite or proper for the government and administration of its local and municipal matters, * * *." The expressed intention of the constitutional provision was to grant to home rule cities, "* * * the full right of self-government in both local and municipal matters * * *." It is expressly provided that "The statutes of the state of Colorado, so far as applicable, shall continue to apply to such cities and towns, except in so far as superseded by the charters of such cities and towns or by ordinance passed pursuant to such charters."

By the adoption of Article XX the people unquestionably intended to enlarge the powers of home rule cities beyond those possessed by cities and towns prior to its adoption. Long prior to the adoption of Article XX, cities and towns had been given the power, "* * * to suppress gaming and gambling houses, * * *." C.R.S. '53, 139-32-1 (52). This would clearly indicate that the General Assembly viewed questions relating to the suppression of gambling as matters which were essentially "local and municipal."

C.R.S. '53, 139-33-1 provides that cities and towns shall "have power to make and publish, from time to time, ordinances not inconsistent with the laws of the state, for carrying into effect or discharging the powers and duties conferred by this chapter, * * *." Obviously this section does not place limitations upon the authority of home rule cities which have roots in the constitution. Article XX unquestionably contemplates that in matters local and municipal state law may be "superseded" by an ordinance within the boundaries of the home rule city.

It is suggested that the ordinance of the city of Denver imposes a greater penalty for gambling than does the state statute and that even assuming the premise that gambling is a matter which presents "local and municipal" problems the "inconsistency" of punishment between the statute and the ordinance would necessarily invalidate the ordinance. It is not true that all differences between an ordinance and a statute result in an inconsistency which is fatal to the ordinance.

It is a fundmental principle applicable to home rule cities, as well as other cities and towns, that a municipal ordinance can neither destroy a basic right created by statute nor can it authorize an act which the state law prohibits. A municipal ordinance could not legalize gambling, prostitution or other vice prohibited by state law. See 37 Am. Jur. p. 787, McQuillan on Municipal Corporations 2nd ed. Vol. 2, 697, sec. 683. There are numerous authorities for the proposition that although

the state has prohibited certain conduct or regulated conduct in a particular way, nevertheless a municipality may exact additional requirements without creating a conflict which is fatal to the ordinance.

A number of authorities have prescribed tests for the determination of the existence of a conflict between statute and ordinance which would be fatal to the ordinance. In *State v. Carran,* 133 Ohio St. 50, 11 N.E. (2d) 245, we find the following:

"In determining whether an ordinance is in 'conflict' with general laws, the test is whether the ordinance permits or licenses that which the statute forbids or prohibits, and vice versa."

In 37 Am. Jur. p. 790, sec. 165, we find the following pertinent sentence:

"Thus, where both an ordinance and a statute are prohibitory and the only difference between them is that the ordinance goes further in its prohibition, but not counter to the prohibition under the statute, and the municipality does not attempt to authorize by the ordinance what the legislature has forbidden or forbid what the legislature has expressly licensed, authorized, or required, there is nothing contradictory between the provisions of the statute and the ordinance because of which they cannot coexist and be effective."

The foregoing principles were approved, discussed and applied by this court in *Ray v. Denver,* 109 Colo. 74, 121 P. (2d) 886.

In *Ex Parte Hoffman,* 155 Cal. 114, 99 Pac. 517, it was said:

"It may often, and does often, happen that the requirements which the state sees fit to impose may not be adequate to meet the demands of densely populated municipalities so that it becomes proper, and even necessary, for municipalities to add to state regulations provisions adapted to their special requirements."

I am of the opinion that Denver as a home rule city has the power to adopt an ordinance prohibiting gam-

bling because it is a matter which is local and municipal and presents special problems in urban communities which warrant special treatment at the local level. The Denver ordinance does not permit or license that which the state law forbids; nor does it prohibit a course of conduct by any citizen which as a matter of right is conferred upon him by statute. The increased burden by way of a greater penalty which is imposed by the ordinance is not "in conflict" with the state law in a legal sense.

Solely on the grounds expressed, and not for the reasons set forth in the opinion of Mr. Justice Doyle, I would affirm the judgment.

Mr. Justice Frantz dissenting:

Once again an effort is being made to compress the compass of *Canon City v. Merris*, 137 Colo. 169, 323 P. (2d) 614. I had thought that decision to be eminently correct when it was released; I retain that conviction; and being so convinced, I must resist any attempt at shrinking its scope and effect.

By statute gambling is forbidden and a penalty provided for its violation. C.R.S. '53, 40-10-10. By another statute, cities and towns are vested with the authority to *"suppress* gaming and gambling houses, lotteries and fraudulent devices and practices, for the purpose of gaining or obtaining money or property * * * " (Emphasis supplied.) C.R.S. '53, 139-32-1 (52).

Then, too, cities or towns are empowered "to pass all ordinances, rules, and make all regulations proper or necessary to carry into effect the powers granted to [them], with such fines and penalties as the council or board of trustees shall deem proper; provided, no fine or penalty shall exceed three hundred dollars, and no imprisonment shall exceed ninety days for one offense."

Whether acting pursuant to C.R.S. '53, 139-32-1 (52), or in the belief it had such power under the 20th Amend-

ment to the constitution of this state, Denver did enact an ordinance which made it "unlawful for any person to * * * play for money or any valuable thing at any game with cards, dice, or with any article, device, or thing whatever, which may be used for the purpose of playing or betting upon, or winning or losing money or other property; or to bet on any game others may be playing."

It is of moment that we note the difference in punishment which may be inflicted for gambling. Under the statute (C.R.S. '53, 40-10-10) the person convicted "shall be fined in any sum not less than fifty dollars nor more than one hundred and fifty dollars." No specific penalty being provided in the ordinance relating to gambling, the general penalty provision of the Revised Municipal Code of the City and County of Denver applies, and it permits the imposition of a fine "in a sum not more than three hundred dollars ($300.00)" or that the person convicted be "imprisoned not to exceed ninety (90) days, or both so fined and imprisoned." Section 011.10.

This difference in penalty takes on importance if gambling is a matter of state-wide cognizance because, should C.R.S. '53, 139-32-1 (52), represent a proper delegation of authority to cities and towns, then the exercise thereof and the imposition of punishment in connection therewith would have to be in harmony with C.R.S. '53, 139-33-1, which ordains:

"Municipal corporations shall have power to make and publish, from time to time, ordinances not *inconsistent* with the laws of the state, for carrying into effect or discharging the powers and duties conferred by this chapter, and such as shall seem necessary and proper to provide for the safety, preserve the health, promote the prosperity, improve the morals, order, comfort and convenience of such corporation and the inhabitants thereof, and to enforce obedience to such ordinances by fine not exceeding three hundred dollars, or by imprisonment not exceeding ninety days." (Emphasis supplied.)

Of course, if the problem of gambling is essentially

local and municipal, Denver did not derive its power to enact its gambling ordinance from C.R.S. '53, 139-32-1 (52), since Denver is a home rule city authorized to adopt carte blanche ordinances relating to local and municipal affairs by virtue of Article XX, Section 6, of the constitution, and it is no concern of the legislature as to what local and municipal problem prompts the enactment of the ordinance. *Denver v. Henry,* 95 Colo. 582, 38 P. (2d) 895; *Pueblo v. Kurtz,* 66 Colo. 447, 182 Pac. 884.

Is there an area of interest in gambling which can be said at once to be state-wide and local and municipal, in which the first to act legislatively preempts the field, or in which either may enact laws enforceable by the enactor, and if so, does the first to proceed against the violator take jurisdiction to the exclusion of the other? Is gambling a matter of state-wide concern, reposing in the General Assembly the sole power to enact legislation in connection therewith, or does it pose a local and municipal problem, making effective the application of the 20th Amendment?

Article III of the Constitution of Colorado provides:

"The powers of the government of this state are divided into three distinct departments — the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution *expressly* directed or permitted." (Emphasis supplied.)

Article V, Section 1 of the Constitution of Colorado, in reserving to the people the initiative and referendum, commences: "The legislative power of the state shall be vested in the general assembly consisting of a senate and house of representatives * * * " Article IV, Section 11 of the Constitution of Colorado vests in the governor of this state the power to approve or disapprove every bill

passed by the general assembly and provides for further legislative action in the event of his disapproval.

Thus, the Constitution vests the legislative power of the state in the General Assembly, the veto power in the Governor, and these powers are not delegable except where "in this constitution *expressly* directed or permitted." Delegation of this power to legislate cannot be bestowed by implication, and no implied power to so delegate can be evolved by interpretation; the Constitution explicitly forbids it. Whatever the legislature passes in the proper exercise of its constitutional authority, a municipality cannot in effect veto, either in whole or in part, by adopting ordinances contrary to, inconsistent with, or at variance with parts of, such enactments; the Constitution explicitly forbids the exercise of veto by anybody but the Governor.

The question immediately comes to mind: Wherein can it be said that the 20th Amendment "expressly" grants to a home rule city the power to enact ordinances on any governmental business other than those of purely local and municipal concern? A more than cursory perusal of Article XX, Section 6, bends one's will to respond: The explicit wording of the amendment does not admit of a vagrant, elastic interpretation. Only local and municipal matters are "expressly" made the concern of a home rule city; indeed, not only does the language "expressly" make manifest that the authority of a home rule city begins and ends with local and municipal activities, but where the language leaves any room for resort to implication, the implication is against action beyond local and municipal affairs. Nota bene!

Article XX, Section 6 enables a city or town to adopt, amend or replace a charter "which shall be its organic law and extend to all its local and municipal matters." It further provides that "[s]uch charter and the ordinances made pursuant thereto in such [local and municipal] matters shall supersede * * * any law of the state in conflict therewith." "Expressly," supersedure

of state law extends only to charter or ordinances dealing with local and municipal matters; impliedly, supersedure does not extend beyond that which is local and municipal in character. Moreover, there is no "express" delegation of power to the city or town to legislate on matters having an amalgam of significance to both state and municipality.

Continuing our consideration of Section 6 of the 20th Amendment, mark that the certification to and filing with the Secretary of State of the charter vests in the city or town "the powers set out in sections 1, 4 and 5 of this article, and all other powers *necessary, requisite or proper* for the government and administration of its *local and municipal matters, including* power to legislate upon, provide, regulate, conduct and control: [enumerating authority to act in several local and municipal areas]." The key to home rule action again is the local and municipal character of the function involved. And among the local and municipal matters are included several enumerated local and municipal activities. See specially concurring opinion of Mr. Justice Moore in *Canon City v. Merris,* supra.

Quoting further: "It is the intention of this article to grant and confirm to the people of all municipalities coming within its provisions the *full right of self-government in both local and municipal matters,* and the enumeration herein of certain powers shall not be construed to deny such cities and towns, and to the people thereof, any right or power essential or proper to the *full exercise of such right."* (Emphasis supplied.) The recurring theme is the power to act in local and municipal matters: home rule cities or towns shall have "the full right of self-government in both local and municipal matters" and any right or power essential or proper to the full exercise of such right.

It is then provided that "[t]he statutes of the state of Colorado, so far as applicable, shall continue to apply to such cities and towns, *except in so far as superseded by*

*the charters of such cities and towns or by ordinance passed pursuant to such charters."* (Emphasis supplied.) Placing the exception in proper perspective, we must advert to another segment of the amendment, already quoted, to-wit: "Such charter and the ordinances made pursuant thereto in such [local and municipal] matters shall supersede * * * any law of the state in conflict therewith." Thus, the several portions brought in right relation to each other expressly ordain that the applicable statutes have force and effect in home rule cities or towns except where superseded by charter or ordinances on local and municipal matters.

Always keeping in mind that ordinances on local and municipal matters may be adopted pursuant to the authority of the charter, we now consider subsection h, Article XX, Section 6, which provides for "the imposition, enforcement and collection of fines and penalties for the violation of any of the provisions of the charter, or of any *ordinance adopted in pursuance of the charter."* Also, that part of the section reading as follows, "Any act in violation of the provisions of such charter or of *any ordinance thereunder* shall be criminal and punishable as such when so provided by any statute now or hereafter in force." Nothing could be plainer than the limitation of power with which home rule cities and towns are invested. An eligible city or town may have a charter which shall be its organic law and extend to all its local and municipal matters. Ordinances may be enacted pursuant to such charter in such local and municipal matters. Such charter and such ordinances supersede state law in conflict therewith, and such charter and such ordinances are subject to the penalizing power of the home rule city. No greater power is expressly granted to a home rule city; whatever implications can be deduced from the language, all work contrary to there being any power greater than that to be exerted upon local and municipal matters.

There is nothing to seek between the lines of Article

XX, Section 6, because nothing is there. The amendment is open as day, expository and single-purposed. This is exemplified by certain bellwether words which should keep us from going astray. These words are: "charter" and "ordinances made pursuant to" such charter in such local and municipal matters. The charter "shall be its organic law and extend to all its local and municipal matters." "Such charter and the *ordinances made pursuant thereto* in such [local and municipal] matters shall supersede * * * any law of the state in conflict therewith." Ordinances made pursuant to a charter which "extends to all its local and municipal matters," let me say by way of emphasis. A home rule city or town may impose, enforce and collect fines and penalties "for the violation of any provisions of the *charter,* or of any *ordinance adopted in pursuance of the charter."* The statutes shall prevail "except as superseded by the charters * * * or by *ordinance passed pursuant to such charters."* "Any act in violation of the provisions of such charter or of *any ordinance thereunder* shall be criminal," and so forth. Always the charters extend to all local and municipal matters; always the ordinances must be enacted within the scope of the charters; here is the plain import of the 20th Amendment.

Hence, there can be no concurrent authority. Whatever is adequate to warrant the exercise of the "legislative power of the state" is a matter of statewide concern, and if the General Assembly legislates thereon, the statute is applicable throughout the length and breadth of the state. According to Article XX, Section 6, Denver or any other home rule city is amenable to the statute thus enacted.

To hold that municipality and state may each act in certain twilight spheres because of common concern regarding such matters necessarily recognizes a delegation of legislative power impliedly bestowed. Yet the whole 20th Amendment bespeaks the delegation of express powers, negatives the bestowal of implied powers, and,

in fact, all implications therein indicate restriction of power to those expressly granted.

Cities and towns shall always have a vital interest in any problem of a statewide nature. To refer to a statewide matter is to refer to something that affects every part of the state. A matter could not be of statewide concern if it did not affect all parts of the state, including cities and towns, whether they be home rule municipalities or not. Degrees of concern should not be the measuring stick. Murders in Denver may give it an ascendancy of concern in regard to them over the towns of Red Cliff or Red Wing or other cities and towns of Colorado, but that is not, and should not be, the test. If there is present a generality of concern throughout the state in a problem, regardless of peaks and dips in the level of interest therein, the matter is of statewide cognizance.

Such dissection of the 20th Amendment led us to say in *Canon City v. Merris,* supra:

" 'Supersede' is defined 'as meaning to supplant * * *; to replace, displace, or set aside and put another in the place of; to take the place of by reason of superior worth, appropriateness, efficiency or right.' 83 C.J.S., p. 889. In the company of words appearing in Article XX, Section 6, the term 'supersede' means that the law of the state is displaced on a local and municipal matter where there is an ordinance put in its place. Where, however, the matter is of statewide concern, supersession does not take place. Application of state law or municipal ordinance, whichever pertains, is mutually exclusive."

With a more exacting scalpel Mr. Justice Moore did a more extensive dissection in his concurring opinion, and concluded:

"The meaning of this language is plain. There is no room for strained construction. The effect of it is that until such time as a home rule city enters a given field of legislative enactment by a *proper* exercise of the delegated legislative power, the applicable law of the state

shall govern. If the state law is to be rendered ineffective within the city limits on a matter which is 'local and municipal' the city council can adopt an ordinance which thereupon 'supersedes' the state law within the city limits. By no stretch of the imagination can this constitutional provision be held to warrant the adoption of a city ordinance on a matter which is of general or statewide concern as distinguished from a 'local or municipal matter.'"

Mr. Justice Moore and I had an abundance of precedent to vindicate our utterances. These precedents merely accepted the plain language of the 20th Amendment at face value, and sought not to embellish or deform its simple grant of power to home rule cities and towns, that they shall exercise self-government in local and municipal matters. I would have us adhere to our previous pronouncements. This does not deny that there may be a problem of application, for questions of statewide versus local and municipal concern will trouble courts in the future as they have in the past.

That supersession takes place only as to local and municipal matters has been time and again intimated in the decisions of this court. Without any attempt to cite all the cases so indicating, I would point out some which sustain the proposition.

In order to sanction a regulation of a home rule city, we must determine that the regulation of the subject "is *purely* a local matter." *Walker v. People,* 55 Colo. 402, 135 Pac. 794. Such determination must result from the distinction between governmental powers and functions and "matters of *purely* local and municipal character." *People v. Denver,* 90 Colo. 599, 10 P. (2d) 1106.

The effect of modifying words showing the extent to which a home rule city may exercise its delegated power is nowhere better exemplified than in the case of *Mauff v. People,* 52 Colo. 562, 123 Pac. 101. The following quoted portion of the decision is so much in point that the potent modifying words I have capitalized and other

words expressing limitations of power of home rule cities have been italicized.

"The purpose of article XX was to give to the people of the city and county of Denver exclusive control in matters of *local concern ONLY.* The people of the city and county of Denver *have no power whatever* to legislate by their charter upon matters of state and county governmental import and character. The fact that the authority given by article XX to the people of the city and county of Denver to legislate was confined and *limited SOLELY to local matters* was the precise thing that made it possible for the courts to uphold and enforce it. *If by article XX it had been undertaken to free the people of the city and county of Denver from the state constitution, from statute law, and from the authority of the general assembly, respecting matters other than those PURELY of local concern, that article could not have been upheld.*"

Whatever is local and municipal is subject to the jurisdiction of the home rule city. All other matters are subject to the control of the state. This is the unequivocal meaning of *People v. Graham,* 107 Colo. 202, 110 P. (2d) 256. Note:

"The only question with which we are here concerned is whether the derelictions charged in the information are violations of regulations of motor vehicle traffic of a local and municipal nature, over which a home-rule city has exclusive jurisdiction. *If not, the general laws of the state apply.*" (Emphasis supplied.)

Decisions have drawn the line of demarcation between matters subject to the jurisdiction of state or municipality on whether the subject of action has aspects beyond that which is local and municipal in character. Thus, it has been said that the home rule municipality is "as much amenable to state control in all matters of a public, as distinguished from matters of a local, character *as are other municipalities.*" (Emphasis supplied.) *Keefe v. People,* 37 Colo. 317, 87 Pac. 791, 8 L.R.A.N.S.

131; *Mauff v. People,* supra; *People ex rel. v. McNichols,* 91 Colo. 141, 13 P. (2d) 266.

It appears to me that the point of cleavage in making the above distinction is this: local and municipal matters are subject to municipal action, but, if there is something additional in the way of an interest in which the public has a concern, then the state has jurisdiction. Perhaps this is made more definite by an additional quotation from *People ex rel. v. McNichols,* supra. A state law concerning vital statistics was involved and the court held that vital statistics "are not of local concern *only;* they are of general public importance." The purport of the quoted section is that vital statistics are of local concern, but that such concern does not end there; that the general public has an interest in vital statistics. Hence, the home rule city is controlled by the statute.

The last cited case suggests a guide for determining when a matter is subject to the jurisdiction of the state or of a home rule city. Other guides appear from decisions rendered by this court. For instance, the fact that a home rule city may attach a more immediate and greater importance to a subject than may be found in the general public does not make that subject a local and municipal matter only. If the state at large has an interest, the law of the state takes precedence.

Such is the purport of *People ex rel. v. McNichols,* supra. And such is the purport of two other decisions of this court. It was said in *Keefe v. People,* supra, that:

"The work of building a sanitary sewer by a city, in a sense, is local, in that it affects, *primarily,* its own citizens; but it is directly connected with the public health, and is a matter of concern and great importance to the people of the entire state."

Hence, a state statute regulating hours of labor on public works was held applicable to Denver.

To like effect was the decision in *Denver v. Bossie,* 83 Colo. 329, 266 Pac. 214. We quote:

"That the building and maintenance of a court house

is of general public interest is manifest from the necessities of justice. That a court house and its usual incidents be maintained in Denver county is of *nearly as great importance to the state at large as to Denver,* and so of the court house of every other county. The legislation of the state which requires every county to maintain such a place is a recognition of this proposition." (Emphasis supplied.)

The lesson to be drawn from these last three decisions is this: even though the subject of state legislation has a greater impact upon the municipality than upon the public at large, still the fact that the general public has an interest in the matter makes the matter properly one for state action.

Another test resorted to in a number of cases may be put this way: whatever the legislature might have granted to a city before the adoption of the 20th Amendment constitutes a local and municipal matter upon which the city may legislate. *City of Pueblo v. Kurtz,* 66 Colo. 447, 182 Pac. 884, makes this clear in these words:

"* * * the city has the right under the XXth amendment and the Home Rule amendment to adopt any provision for its charter on subjects local and municipal or 'of local concern,' and such provision supersedes the statute. Subjects local and municipal or of local concern are held * * * to include any power which the Legislature might have granted before the amendment."

Unless there is an *express* constitutional provision permitting it, the general assembly may not transfer its legislative power to any other governmental agency. Such is the substance of Article III of the Constitution. Such has been the sense of decisions of this court. *In re Senate Bill No. 72,* 139 Colo. 371, 339 P. (2d) 501; *Casey v. People,* 139 Colo. 89, 336 P. (2d) 308; *Travelers Insurance Co. v. Industrial Commission,* 71 Colo. 495, 208 Pac. 465; *Colorado, etc. Co. v. Railroad Commission,* 54 Colo. 64, 129 Pac. 506; *Burcher v. People,* 41 Colo. 495, 93 Pac. 14, 124 Am.S.R. 134.

*In re Senate Bill No. 72,* supra, contains answers to interrogatories of the Governor on the very question here considered. A fair statement appears in the syllabus of the Pacific Reporter:

"Senate Bill providing that where subject matter of municipal ordinance may be of *both local and state-wide concern,* existence of state legislation on subject matter, or subsequent adoption of state legislation thereon, shall not deprive municipal corporation of right or power to make ordinances thereon not inconsistent with laws of the state, unless statute declares that only state shall have power to adopt legislation thereon, and that where statute and ordinance cover same subject matter so that same act can be prosecuted as criminal matter both for violation of statute and ordinance, prosecution for ordinance violation shall bar prosecution under statute and prosecution under statute shall bar prosecution under ordinance, *is an invalid delegation of legislative power* in violation of the Constitution. Const. art. 5, § 1; C.R.S. '53, 139-33-1(3)." (Emphasis supplied.)

In November, 1912, the people of this state adopted the present Section 6 of Article XX of the Constitution of this state. A part of said section provides that:

"Any act in violation of the provisions of such charter or of any ordinance thereunder shall be criminal and punishable as such when so provided by any statute now or hereafter in force."

Concerning this quoted portion of Section 6, we said in *Canon City v. Merris,* supra, that "[e]ven though an ordinance effectually covers a local and municipal matter, and it is a counterpart of a law of the state, its violation is triable and punishable as a crime where so designated by the statute."

Prior to the adoption of Section 6 of Article XX, it had been declared that "[t]he state has never relinquished to the new city and county of Denver, and *never can surrender to it,* the power to enact laws to punish crimes and misdemeanors, and the operation of such laws

embraces all of the people of the state, whether living in municipalities or counties created directly by the constitution, or organized under general laws. Such legislation would not be valid if it expressly exempted the city and county of Denver from its operation." (Emphasis supplied.) *Keefe v. People,* supra.

Later, the circumscription expressed in the Keefe case was considerably softened and intimation made that the people could permit a delegation of authority by the general assembly to define and punish crime. For this court stated, "The people have confided to the general assembly the power of declaring what acts or omissions shall constitute a crime, but they have not confided to the general assembly the authority to transfer this power to any other person or body." *People v. Lange,* 48 Colo. 428, 110 Pac. 68.

In a very recent case, *Casey v. People,* supra, not involving a home rule city, we perhaps too broadly stated, "Only the legislature may declare an act to be a crime. People v. Lange, supra. That precious power cannot be delegated to others not elected by or responsible to the people."

Although too sweeping in denying the power of the people to delegate legislative authority, because Article III of the Constitution decrees that it will be recognized where "expressly" granted in the Constitution, the language of this opinion is clearly correct in that legislation on crime of state-wide import has not been committed to "others not elected by or responsible to the people."

Denver has been delegated authority by the people to make a charter and to enact ordinances extending to local and municipal matters, the violation of which shall be criminal and punishable as such when such charter and ordinances have counterpart statutory provisions the violation of which is criminal. Does municipal action regarding gambling fall within that which may be considered purely local and municipal?

It should be observed that C.R.S. '53, 139-32-1 (52),

empowers cities and towns to "suppress gaming and gambling houses," and gambling devices and practices. The investiture of cities and towns with this authority follows traditional legal decorum. "One of the most unusual powers enjoyed by municipal corporations is that of abating or suppressing nuisances." 62 C.J.S. §281, p. 629.

We have held that the keeping and use of gambling devices, being prohibited by statute, are common nuisances. *Gambling Devices v. People,* 110 Colo. 82, 130 P. (2d) 920. Gaming and gambling houses are nuisances. *People ex rel. v. District Court,* 26 Colo. 385, 58 Pac. 604, 46 L.R.A. 850. See 66 C.J.S. §48, p. 800. To the extent that Denver suppresses gambling houses or devices, or gambling, it had the power without resort to the statute.

But may Denver define gambling, make it an offense and provide for the punishment by fine or imprisonment, or both, in the event of a violation of the ordinance? It may if gambling is a purely local and municipal matter. Is it such? *Salt Lake City v. Doran,* 42 Utah 401, 131 Pac. 636, holds that the large and populous municipalities present greater opportunities for successful gambling operations, thereby making it a local and municipal problem. There are cogent reasons why I cannot agree.

The fact that crime can be more fruitful and accomplished with greater ease in more densely populated areas is not a reason for making it a local and municipal matter. If this were true, then burglary and robbery, for instance, might be said to be local and municipal. In order for an ordinance to supersede a statute defining a crime, the city adopting such ordinance must have some peculiar circumstances which present a local and municipal problem. The peculiar circumstances may be such that, as a matter of law, it may be said that the subject of the ordinance is of concern to the municipality. On the other hand, whether the problem is truly a local and municipal concern may be a question of fact.

Gambling per se is a problem of general importance

to the state, so much so that several statutes have been enacted prohibiting various phases of gambling. C.R.S. '53, 40-10-8, et seq. Penalties are provided for the violation of these several sections. In enacting these statutes the legislature prima facie enacted public laws. The legislature believed that gambling was the proper subject of a public law.

There is no more quoted section of our statutes than C.R.S. '53, 40-1-1, which defines crime:

"A crime or misdemeanor consists in a violation of a *public law* * * * " (Emphasis supplied.)

It is an offense against the sovereign, and a criminal action is one prosecuted by the state against a person charged with a public offense committed in violation of a public law. *Hoffman v. People,* 72 Colo. 552, 212 Pac. 848. That the legislature permitted cities and towns to "suppress" gaming and gambling houses and gaming devices and practices indicates that it retained power to define offenses involving gambling and to provide for their punishment.

Gambling has been considered so completely a matter of state-wide concern that its legitimation has been believed to be a matter for the voters of the state to act upon. Consider the ordinance in question. If it is a matter of local and municipal concern, it is then something that the state can never affect by legislation. If it is a matter of local and municipal concern, the state would be foreclosed from passing any law on the subject which could be effective in Denver. If it is a matter of local and municipal concern, Denver could adopt by amendment such an innocuous ordinance that in effect gambling would be sanctioned within the confines of the city. For these reasons I believe that gambling must be considered not only as being of local concern, but equally of state-wide interest, and ergo, subject to state control.

The state could have delegated to Denver the power in form of ordinances to enact rules and regulations by which Denver as an agency of the state would aid the

state in controlling gambling. This is well brought out in the case of *Board of County Commissioners v. Smith,* 22 Colo. 534, 45 Pac. 357, 33 L.R.A. 465:

"Judge Dixon was of opinion that the power conferred upon the boards of county commissioners could be sustained upon either of two principles of constitutional law: First, the law being complete, its operation might be made contingent; second, because such delegation is in the furtherance of the power of local self-government.

"It will be conceded that the powers conferred upon the legislature to make laws cannot be delegated to any other body or authority, except as the principle may be modified by the second maxim. It is, however, not essential that the law should take effect immediately upon its leaving the hands of the legislature. Its operation may, under certain limitations, be made to depend upon a contingency.

"Mr. Justice Agnew, speaking for the court in *Locke's Appeal,* 72 Pa. St. 491, says: 'What is more common than to appoint commissioners under a law to determine things, upon the decision of which the act is to operate in one way or another? * * * Then the true distinction, I conceive, is this: — the legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and must therefore be the subject of inquiry and determination outside the halls of legislation.' "

In recent decisions Mr. Justice Moore has affirmed this proposition. *Hazlet v. Gaunt,* 126 Colo. 385, 250 P. (2d) 188; *Prouty v. Heron,* 127 Colo. 168, 255 P. (2d) 755.

I have stated what I believe to be an irrefutable position on spheres of operation for state and home rule

cities. These views are in diametric opposition to those expressed by Mr. Justice Doyle.

MR. CHIEF JUSTICE HALL joins in this dissenting opinion.