COMMUNITY COMMUNICATIONS COMPANY, INC., Plaintiff,

v.

CITY OF BOULDER et al., Defendants.

Civ. A. No. 80–M–62.

United States District Court, D. Colorado.

Sept. 5, 1980.

Stephen M. Brett, Robert E. Youle, Sherman & Howard, Denver, Colo., Harold R. Farrow, Thomas A. Seaton, H. Wayne Goodroe, Farrow, Schildhause & Wilson, Oakland, Cal., for plaintiff.

Joseph N. de Raismes, Alan E. Boles, Jr., Boulder, Colo., for City of Boulder.

John A. Purvis, Steve C. Briggs, Hutchinson, Black, Hill, Buchanan & Cook, Boulder, Colo., for other defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

For a second time I have found it necessary to use the power of a preliminary injunction to protect Community Communications Company, Inc. (CCC) from irrevocable injury pending the final resolution of the dispute between the plaintiff and the City of Boulder. In an earlier Memorandum Opinion and Order, entered on March 17, 1980, and reported as *Community Communications Company, Inc. v. City of Boulder*, 485 F.Supp. 1035 (D.Colo.1980) I described the circumstances giving cause for the complaint which first brought the parties into this Court. As there indicated, on December 19, 1979 the Boulder City Council passed an emergency ordinance which restricted the rights granted in a 1964 ordinance by prohibiting CCC from extending service to new customers for three months. The purpose of that moratorium was to limit the growth of the business of CCC while the City sought to negotiate with CCC, and other companies, for a new contract to service the City's residents in a manner which the City Council might consider appropriate. In the view of the City Council the presence of CCC operating a community antennae service in a small area of the city created such a threat of a monopolistic advantage as to require that restriction to permit other companies to come in with competing proposals.

In issuing that first injunction, I recognized that the period of limitation was about to expire without accomplishment of the City's objectives and that the very fluid facts of the case were still developing. Accordingly, while I decided that the antitrust implications controlled the question of a preliminary order, I also sought to caution the City about the possibilities of First Amendment involvement and other questions of possible constitutional concern.

The moratorium had already expired when the City's appeal of that injunctive order was argued to a three–judge panel of the Tenth Circuit Court of Appeals. Acting entirely on its own motion, and without any explanation, that panel went beyond the moratorium ordinance and entered its own order preventing CCC from expanding its service area until further order of the appellate court. On May 28, 1980, an opinion for two judges of the panel was filed, directing the reversal of my order, remanding the case, and terminating the stay order. It was further noted that Judge Markey[1] would be submitting a separate opinion.

He filed a vigorous dissent on July 1, 1980. On that same day, the Boulder City Council took new action against the plaintiff by passing Ordinance No. 4515 on first reading. The Council had earlier enacted emergency ordinances on June 3 and June 24, providing for additional periods of temporary restrictions of the plaintiff's expansion plans while the Council attempted to determine its position on the future of cable television in that community. I denied new motions for temporary restraining orders during that time, to enable the Boulder City Council to go forward with its legislative process. A motion for reconsideration filed in the Court of Appeals by CCC on June 25, 1980 has not yet been determined. Accordingly, I have not yet received a mandate from the Court of Appeals.

The questions presented by Ordinance No. 4515 are far different from what was before me earlier and now before the Court of Appeals. Because time is a critical element, it has been necessary to go forward on the plaintiff's amended complaint and second motion for preliminary injunction without waiting for further action by the appellate court. Additionally, the City also filed its own motion for a preliminary order to prevent the plaintiff from violating the restrictions of the new ordinance.

---

1. Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

Before turning to the questions presented, it is appropriate again to recognize that the case is not yet presented on the merits. While the evidence before me is extensive, and while the City has presented what purports to be the complete legislative record, I do not now know what further proof the plaintiff may submit to establish conspiratorial conduct among the named defendants.

Ordinance No. 4515, finally adopted on July 22, 1980, with an effective date of August 21, 1980, places a permanent geographic limitation on the plaintiff's pre-existing contract right to establish and operate a cable television communications system throughout the City of Boulder. More particularly, that right has now been reduced to a permission to provide service to a prescribed area encompassing only one-third of the City's residents. That area includes the portion of the city in which CCC has historically functioned as a community antennae system, plus the area it had expanded into prior to July 1, 1980.

The impasse which has developed between CCC and Boulder must be broken by granting one of their motions for a preliminary injunction. Thus, either the plaintiff must be prohibited from violating or the City must be prevented from enforcing Ordinance No. 4515. Recognizing the complexity of the legal issues and the absence of controlling precedent, an appropriate analysis should begin with a comparison of the competing claims of irreparable injury in the absence of injunctive relief.

The City's claim is that it is seeking advanced, state-of-the-art communications services for its citizens and that while other companies have expressed an interest in providing such services on terms to be negotiated, all of them have declined to proceed unless CCC is excluded from the market area. Thus, it is argued that unless the plaintiff is prohibited from expanding into the area to be made available to other companies, the negotiating process will be seriously disrupted.

Conversely, CCC contends that the City's revocation of the right to conduct business in two-thirds of the city, simply to benefit other companies, constitutes an unlawful restraint of trade in violation of Section 1 of the Sherman Act; that it infringes rights protected by the First Amendment; that it denies equal protection of the law; that it constitutes an inverse condemnation of the plaintiff's property; and that it otherwise is an unconstitutional infringement of contractual and property rights.

The test for whether irreparable injury exists, requiring the equitable remedy of injunction, is the inadequacy of the recognized legal remedy if the party seeking the preliminary injunction ultimately prevails. In this case, with conflicting claims of such irreparable injury, the question becomes one of the comparative capacity of the Court to right the wrong to the party who finally wins on the merits.

If enforcement of the ordinance is now enjoined, but the City's position is later determined to be correct, the only apparent loss is the time it may take to complete the negotiating process with other companies, free from the inhibiting influences of the plaintiff's market position and this lawsuit. The mere stringing of cables is not a significant concern because this Court obviously has the authority to require the plaintiff to remove those cables and to make any necessary adjustments with customers who are later determined to be outside of CCC's authorized service area.

Alternatively, if the plaintiff is compelled to abide by an ordinance which is later invalidated, the foreseeable injuries may, by their very nature, be irreversible. To the extent that First Amendment rights are infringed, irreparable injury is presumed. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (Brennan, J.); *Westinghouse Broadcasting Co. v. Dukakis*, 409 F.Supp. 895 (D.Mass. 1976); *Borreca v. Fasi*, 369 F.Supp. 906 (D.Haw.1974). Similarly, injunctions are often granted in favor of private antitrust plaintiffs when there is a threat of injury and the prevailing public interest in competitive market conditions will be served. *Zenith Corp. v. Hazeltine*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

■ Finally, in considering the public interest, there is the apparent difficulty of measuring the plaintiff's economic loss in money damages coupled with the devastating impact of a large judgment on the defendant municipality and its citizens. And there should be concern for those persons who may want to subscribe to the services provided by CCC while this case is pending. (Exhibit I–2e, pp. 1540–42). Accordingly, it is my judgment that the relative risks of irreversible injury to the parties, as well as the public interest, compel the conclusion that enforcement of the ordinance must now be enjoined.

■ The questions of law which are presented in this case are difficult and novel. In ruling on a motion for a preliminary injunction, the probabilities of final success on the merits must be considered; but "it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain. * * * (I)t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 781–82 (10th Cir. 1964). There is no doubt in this case that plaintiff has met such a standard and is entitled to injunctive relief from enforcement of the new ordinance.

The facts now before me are markedly different from those involved in the preliminary injunction which is now on appeal. We are no longer concerned with the adverse effects of a temporary interruption of the plaintiff's business. There has now been a unilateral revocation of its right to reach the major portion of the Boulder market for purposes which are questionable, considering the constitutional principle of limiting government to delegated powers.

The stated reason for the revocation is to create side–by–side competition so that different cable companies are "exposed to review and comparison" (Exhibit I–2e, p. 1524), the ultimate objective being to obtain a permittee promising the most advanced programming and communications services. Since the record shows that CCC has in fact "offered" what appears to be a state–of–the–art system through its response to the application process in February, 1980 (Exhibit I–2c, pp. 965–1095), a fair inference is that its fault is not a failure to "offer" such service for consumers, but a refusal to be contractually bound to provide programming subject to the approval of the City's government. Throughout the 1979 study sessions there are such comments as: ". . . you may be able to extract some additional concessions in terms of either their contribution or their local programming commitment" and: ". . . this is what we want if you're going to do anything in this community." (Exhibit I–2a, pp. 39, 54). A status report by the library director was critical of the present permit because it "offers no guarantees" that expanded programming will occur. (Exhibit I–2a, p. 89).

The City Attorney's position in 1979 was that a Boulder franchise "should include reservation of channels and reservation of some responsibility for determining both programming as well as simply channel-by-channel programming by the cable company" (Exhibit I–2a, p. 114), and his position now continues to be that the plaintiff's proposal in February of 1980, though it outlines a sophisticated and wide–range system, offers the City "virtually nothing" because the programming is not made mandatory (Exhibit I–2e, p. 1550).

As currently presented, the policy of the City Council is much different from the stated objective of the moratorium, which was merely solicitation of interest by other companies in the Boulder market. Permanent districting imposes rigid control over natural market forces, raising obvious antitrust concerns which would not be removed even if Chief Judge Seth's opinion becomes the law of this case.

■ Immunity from antitrust laws is granted only for governmental action which meets the requirements set out by the Supreme Court in *California Retail Liquor Dealers' Association v. Midcal Aluminum,*

*Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). Thus, the actions must be governmental in nature and they must be taken pursuant to a clearly articulated and affirmatively expressed policy. Additionally, the governmental entity must actively supervise the implementation of that policy by comprehensive regulation, monitoring of conditions, and pointed re-examination of the process. In Judge Seth's opinion, a home rule city in Colorado can claim immunity for a temporary moratorium imposed to foster competition for obtaining a franchise because the Colorado Supreme Court impliedly recognized a municipality's authority to impose rate regulations in a cable system that operates by franchise. *Manor Vail v. Town of Vail*, 604 P.2d 1168 (Colo. 1980).

The permanent exclusion of plaintiff from two-thirds of the City, under a policy requiring continual supervision of what is being offered in terms of programming and communications services, is a much different action with more far-reaching consequences. The initial issue is whether the stated purposes for the exclusion indicate a proprietary rather than a governmental interest. Rather than simply fostering proposals from other companies on a non-exclusive basis, the City now must establish a system of regulation that oversees the "quantity and quality" of cable communications and perhaps dictates certain results through contract negotiations. Essentially, through the mechanisms required by *Midcal*, the City must take control of the future of cable television in Boulder in a manner which is actually proprietary.

While rate regulation in Vail or the solicitation of proposals for permits in Boulder may be considered matters of such local concern as to justify the exercise of sovereign authority by a home rule city, it is certainly doubtful whether control over the quantity and quality of communications can be so characterized. Indeed, the City has relied heavily on FCC cases to justify its conduct here; i. e., *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 297 (1978), without acknowledging the difference between the authority which the United States Congress has delegated to the FCC to patrol the public airways and the parochial interests of the Boulder City Council in protecting the city's streets and alleys. Moreover, the FCC itself has reduced its regulation over cable television because of its unsettled state of development and the differences between cable and the broadcast system. *Brookhaven Cable TV, Inc. v. Kelly*, 573 F.2d 765 (2d Cir. 1978), *cert. denied* 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372. See also Exhibit I-2a, p. 91A.

■ What is required for Boulder to obtain antitrust immunity is exactly that which creates grave First Amendment concerns. While I may have some disagreement with the almost absolutist views expressed by Judge Markey in his dissenting opinion in the Tenth Circuit, it does seem to me that the stated objective of bringing about greater diversity in programming and services will inexorably lead to such control over content as is prohibited by the First Amendment policy of freedom from government control of communications. Even if the governmental interest is viewed as legitimate, the method used to advance it must, under the First Amendment, be substantially capable of serving that interest and it must do so in a manner that is least restrictive of protected rights of speech. *Village of Schaumburg v. Citizens for a Better Environment*, —— U.S. ——, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). There is little in this record to suggest that the objective of achieving diversity in programming and services will be served by a districting ordinance which prohibits the plaintiff from conducting business in the area reserved for others.[2]

Legitimate concerns about repair of property or service blackouts may be addressed directly by a regulation imposing penalties

---

**2.** The City's own cable television expert specifically recommended against districting as not improving competition and not achieving any of the City's objectives other than giving "a piece of the action" to another company. (Exhibits I-2d, p. 1426 and I-2e, pp. 1508-1512).

for failure to correct such problems within a reasonable time. Likewise, a governmental interest in public service programming can be achieved in a direct fashion by negotiation for channels and payment of a fair price for the use of those channels.

Expecting a private communicator to provide, without charge, whatever the City Council may want without a showing of sufficient citizen demand or assurance of company benefit raises concerns both of coerced speech and of proprietary control by government. A generalized judicial approval of regulatory authority over cable television creates the danger that municipal governments may use the leverage of their ownership of the rights–of–way, which provide access to the public, for the exercise of pervasive control over content in an important part of the communications industry. Indeed, if such control is not maintained, can a city assert that active supervision which is required for its antitrust immunity?

It is difficult for me to see how Boulder can avoid the limitations of both of the two national policies which are strongly involved in this case. To achieve its stated purposes by exercising pervasive controls over cable communications is to violate the First Amendment, and a failure to exercise just such controls is to lose any legitimate claim of antitrust exemption.

Even if districting is acceptable as a means of furthering a legitimate governmental interest in cable television, what is the justification for the permanent exclusion of CCC from any access to the restricted area? While the legislative record includes some generalized expressions of discontent with CCC, counsel for the City conceded during oral argument that Boulder does not claim a right to revoke the plaintiff's permit because of a failure to perform any of its obligations. To criticize CCC for providing only the community antennae service to a small portion of the city for many years, without building an advanced communication system for the entire city, does not seem warranted by the evidentiary record. In my earlier opinion in this case, I noted that the evidence shows that the impact of satellite technology on the cable television industry has been very recent. And there is nothing to indicate that the City Council took any significant interest in cable television before the years 1973 and 1974, during which two attempts were made to interest other companies in the Boulder market (Exhibit I–2a, pp. 86–87). The fact that those efforts failed because of financial difficulties suggests that the plaintiff's reluctance to expand was appropriate.

It appears that from 1975 to 1978 some of the City's employees were urging expansion, but that CCC continued to be cautious. It does seem to be significant that the announcement of the plaintiff's plans to extend its operation in May, 1979, evoked an initial enthusiastic response from the Mayor; but, that attitude changed when Boulder Communications Company expressed its interest. It may also be significant that BCC was initially quite willing to accept a permit to construct a system in competition with CCC but that willingness changed when the City Council began to indicate an interest in regulating the market. It is also noteworthy that in the discussions at the Council meetings leading to the enactment of Ordinance No. 4515 the president of BCC was a very strong advocate of the districting approach.

While there are some differences between the long–recognized freedom of the print media and that which is emerging for cable television, those differences are not now relevant in view of the much more significant similarities. Suppose that the Boulder City Council perceived a need for more diversity and better quality in the newspapers available within that community. Suppose further that potential competitors to the Boulder Daily Camera claimed that they could not enter the market unless the Camera were restricted geographically and prevented from any use of the streets and sidewalks to distribute its paper in two–thirds of the City. I cannot imagine that any judge in the United States would not strike down such a restriction.

Yet, the City Council has persuaded itself that cable television is a "natural monopoly" on no better evidence than the assertion of other companies, including BCC, that they are financially unable to enter the city in competition with the plaintiff. It is of such common knowledge that judicial notice may be taken of the fact that increasing costs have caused the decline and fall of many publishing companies. Does the economic reality of one–newspaper cities justify governmental regulation of that business? Of course not. See *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). Why should it then justify the creation of side–by–side cable monopolies by governmental fiat, thereby foreclosing even the possibility of competition in communications within the prescribed areas?

The record in this case is that "competition on the poles" is possible, and it is important to recognize that the plaintiff does not claim exclusivity in the market. It now has less than one–third of the City and it recognizes the right of the City Council to grant new permits to all comers creating direct competition in all of the City. CCC is not in place everywhere and to expand it must do all that a competitor must do in achieving growth and persuading customers to purchase its nonessential services. The City's policies severely inhibit the possibility of naturally–occurring competition. With the costs of satellite receivers rapidly going down, CCC may soon even be competing with private individuals who decide to invest in such equipment, in the same manner as private persons now invest in video tape recorders.

■ The City vigorously contends that the plaintiff has nothing more than a revocable license to use the public ways to convey its product and that what can be revoked in its entirety can be revoked partially. As I said in my earlier opinion, assuming that the City could revoke the license without cause, it does not follow that the City may revoke for an unlawful purpose. Although there certainly remain many questions about what may and may not be regulated by a municipality in the cable television area, the plaintiff has raised very serious concerns which are a "fair ground for litigation and thus for more deliberate investigation." *Continental Oil, supra.* Whatever may be the final characterization of the property right created by the revocable permit granted in 1964, it is a right which is enhanced by its First Amendment character, and it is a right which cannot be revoked for anticompetitive reasons without a more substantial showing of legitimate governmental involvement requiring immunity from the prohibitions of the Sherman Act. It is, therefore, more than a mere license subject to a whimsical withdrawal.

I have not considered at any length the other claims of the plaintiff in the case: the claim of a denial of equal protection, the claim of inverse condemnation, or the question of whether there is a constitutional infringement of contractual or property rights. By not commenting upon them at this juncture, I do not mean to suggest anything with regard to their merit one way or the other. I have simply found that the issues raised by the claims which were discussed are substantial enough to justify an injunction, considering the conclusions I reached in balancing the interests which may be harmed.

This memorandum opinion shall serve as an amplification of the reasons supporting the order of preliminary injunction which I entered on August 25, 1980, and it is now

ORDERED that this memorandum opinion shall be submitted to the Tenth Circuit Court of Appeals as a part of the record in this case.