COMMUNITY COMMUNICATIONS
COMPANY, INC.,
Plaintiff-Appellee,

v.

CITY OF BOULDER, COLORADO,
Defendant-Appellant.

No. 80–1882.

United States Court of Appeals,
Tenth Circuit.

Argued May 12, 1981.

Decided Sept. 22, 1981.

Rehearing Denied Nov. 6, 1981.

Jeffrey H. Howard of Davis, Graham &
Stubbs, Denver, Colo. (Dale R. Harris,

Bruce T. Reese, Glenn W. Merrick, and Kathleen A. McGinn of Davis, Graham & Stubbs, Denver, Colo.; and Joseph N. De-Raismes and Allan E. Boles, Jr., Boulder, Colo., with him on the brief), for defendant-appellant.

Harold R. Farrow of Farrow, Schildhause & Wilson, Oakland, Cal. (Thomas A. Seaton of Farrow, Schildhause & Wilson, Oakland, Cal., and Stephen M. Brett and Robert E. Youle of Sherman & Howard, Denver, Colo., with him on the brief), for plaintiff-appellee.

Thomas B. McMahon, Asst. Atty. Gen., Denver, Colo. (J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., and B. Lawrence Theis, First Asst. Atty. Gen., Denver, Colo., with him on the brief), for amicus curiae Colorado Attorney General.

Blake T. Jordan, Staff Attorney, Wheat Ridge, Colo., on the brief for amicus curiae Colorado Municipal League.

Before SETH, Chief Judge, SEYMOUR, Circuit Judge, and BOHANON,* District Judge.

SEYMOUR, Circuit Judge.

We have been once again asked to reverse a grant by the district court of a preliminary injunction against the City of Boulder, Colorado (City) enjoining the City from enforcing a legislative restriction on the authority of Community Communications Company (CCC) to conduct its cable television business in Boulder. *See Community Communications Co. v. City of Boulder*, 485 F.Supp. 1035 (D.Colo.), *rev'd*, 630 F.2d 704 (10th Cir. 1980) (*Boulder I*). This time the district court preliminarily barred the City from limiting CCC's authorized operations to the geographic area described in Boulder City Ordinance No. 4515.[1] For the reasons set forth below, we believe that during the pendency of this litigation CCC should only be permitted to conduct such operations in the City of Boulder as are necessary to fully provide cable services to customers throughout the area contemplated by Ordinance No. 4515, and to customers outside that area who were actually connected to CCC's cable system as of May 18, 1981.[2] In addition, we conclude the City should be preliminarily barred from issuing any exclusive cable franchise to another cable company for any remaining portion of Boulder until a decision has been rendered on the merits of this case. To the extent the district court's preliminary injunction is inconsistent with these conclusions, it is reversed.

## I.

### The First Injunction

In 1964, the City Council of Boulder granted a nonexclusive, revocable permit to

---

* Of the Northern, Eastern and Western Districts of Oklahoma, sitting by designation.

1. Ordinance 4515 states in pertinent part:

 "*Section 1.* That the revocable permit granted under Ordinance No. 2846 to Colorado Televents, Inc. and its assignee, Community Communications Company, Inc., to conduct the business of a community antenna television system in the City of Boulder is hereby partially revoked, as hereinafter provided.

 "*Section 2.* That Ordinance No. 2846 is hereby amended by the addition of the following:

 "The grantee's right, permit license and privilege to erect, construct, operate and maintain on, under and above the present and future streets, alleys, highways and other public ways and places of the City of Boulder, such poles, lines, cables, wiring and related appurtenances as are necessary for the purpose of originating, receiving, amplifying and distributing television and radio signals to the inhabitants of the City of Boulder shall be exercised only within the geographical boundaries set forth in Exhibit A, attached to this ordinance and incorporated by reference herein.

 "In addition to any and all of the remedies available to the City, a violation of this Section shall be grounds for immediate revocation of the permit granted in Ordinance No. 2846 and forfeiture of the performance bond referred to therein.

 "The right, permit and privilege herein granted is subject to such reasonable requirements as the City Council may subsequently adopt concerning interconnection with other cable systems in the City of Boulder."

2. This is the substance of this court's order of May 18 as clarified July 9, 1981.

a predecessor of CCC, authorizing but not requiring the company to provide cable broadcasting services to all of Boulder. The permit was issued in the form of an ordinance allowing use of the public ways to string cable for a period of twenty years, with the reservation that the City Council could revoke the permit at its pleasure at any time. In 1966, the permit was assigned to CCC.

Under the permit, CCC chose for roughly 15 years to provide cable television service only to the University Hill area of Boulder, an area comprised of approximately 20% of Boulder's residential units and blocked off from normal reception of Denver television stations. In 1979, CCC informed the City of its plans to expand the area it served and the programming it carried. Shortly thereafter, the City received a request from Boulder Communications Company (BCC) for a cable television permit. BCC indicated that regardless of the action the City took in regard to CCC, it planned to begin building a new system as soon as possible after it received a permit.

In response to these developments, the City undertook a study of cable broadcasting technology and concluded that cable systems are natural monopolies. Consequently, the City became concerned that CCC, because of its headstart, would always be the only cable operator in Boulder if allowed to expand, even though it might not be the best operator Boulder could otherwise obtain. The City decided to place a moratorium on CCC's expansion in order to provide other companies the opportunity to make bids to service the remaining parts of Boulder before CCC could become so entrenched that new entry would be impracticable. On December 18, 1979, the City Council enacted a moratorium to restrict CCC from expanding its area of service for 90 days.

On January 15, 1980, CCC filed a complaint against the City in federal district court. The complaint listed several grounds for relief including allegations that the City's actions violated section 1 of the Sherman Act, 15 U.S.C. § 1, and the First Amendment. CCC continued to string cable. When the City tore down some of the new cable, CCC sought a preliminary injunction from the district court to enjoin enforcement of the moratorium.

In its March 17, 1980 decision, the district court recognized that the case presented significant First Amendment questions, but found them "not now ripe for decision." *Boulder I*, 485 F.Supp. at 1040. It focused instead on the Sherman Act claim and granted a preliminary injunction against the City on that basis. The City appealed.

■ This court reversed in a May 28, 1980 decision. We concluded that the trial court had erred as a matter of law in grounding a preliminary injunction on the Sherman Act claim. *See Boulder I*, 630 F.2d 704, 708 (10th Cir. 1980). Because authorization to use public ways for provision of cable service is a matter of local governmental concern,[3] we held the home-rule City of Boulder to be immune from antitrust liability under the state action doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). We noted that the district court had "expressed no other basis for the restraining order than the antitrust factor." *Boulder I*, 630 F.2d at 708.

## II.

### *The Second Injunction*

The 90-day moratorium had expired by the time of our decision in *Boulder I*, so the

---

**3.** We did not hold in *Boulder I* that cable television is a matter of *purely* local concern. There may be a significant state interest in many aspects of the operation of this communication medium. A home rule city may pass legislation regarding a "matter of 'mixed' state and local concern," provided the regulations do not conflict with legislation enacted by the state. *City of Aurora v. Martin*, 181 Colo. 72, 507 P.2d 868, 869 (1973) (*quoting Woolverton v. Denver*, 146 Colo. 247, 361 P.2d 982 (1961)). *See Denver Urban Renewal Auth. v. Byrne*, 618 P.2d 1374, 1385 (Colo.1980); *Century Elec. Serv. & Repair, Inc. v. Stone*, 193 Colo. 181, 564 P.2d 953, 955 (1977) (en banc); *Vick v. People*, 166 Colo. 565, 445 P.2d 220, 221 (1968) (en banc), *cert. denied*, 394 U.S. 945, 89 S.Ct. 1273, 22 L.Ed.2d 477 (1969).

City enacted emergency ordinances on June 3 and June 24 placing further temporary restrictions on CCC's expansion in Boulder while the City considered its alternatives. By this time, three companies besides CCC had submitted proposals to provide cable services to Boulder. However, these other companies, including Boulder Communications Company, indicated they would not accept a permit in any area where CCC had authority to string cable.

The City concluded that direct competition in Boulder between cable companies within the same geographic area will not be possible in the foreseeable future. It settled on districting as the best practicable alternative. Under the City's plan, CCC will be restricted to servicing a single district comprising approximately one-third of the City's population. One or more cable companies will be granted permits to service other districts within Boulder. The City believes that although it cannot have direct competition, the districting plan will at least provide comparison. That is, by having more than one cable company operating in Boulder, the City will have a comparative basis for evaluating permit renewal applications. The City also believes that districting will achieve diversity of cable communications, especially if interconnection is required among cable systems whereby each cable company would make available to its subscribers some portion of the programming carried by other cable companies. In sum, through districting the City hopes to provide for its citizens multipurpose, state-of-the-art cable communication services, including, for example, not only extensive programming but also two-way communications through the cable system.

To begin implementing its districting plan, the City enacted Ordinance No. 4515, *see* note 1 *supra*, which partially revoked CCC's long-standing permit and replaced it with a permanent geographic limitation on CCC's authority to operate a cable system

in Boulder. CCC responded by filing a second motion with the district court for a preliminary injunction. The City cross-moved to enjoin CCC from violating the limitations of the new ordinance.

The district court denied the City's motion and granted another preliminary injunction in favor of CCC, reasoning that the cable company had demonstrated irreparable harm and a reasonable probability of success on the merits of both its Sherman Act and First Amendment claims. *See Community Communications Co. v. City of Boulder*, 496 F.Supp. 823 (D.Colo.1980) (*Boulder II*). On appeal, the City challenges the trial court's reasoning on both grounds.

As an initial matter, we note that the cable broadcasting industry has a prior history of federal, state, and local regulation. *See, e. g.*, Besen, *The Deregulation of Cable Television*, 44 Law & Contemp. Prob. 79 (1981); Comment, *Technology Meets Bureaucracy, The FCC's Policy for Two-Way Television*, 31 Fed.Com.L.J. 413 (1979). Generally, regulation has been premised upon cable companies' need to use public streets and rights of way to lay or string their cable. Local regulation has commonly taken the form of licensing or franchising cable companies. *See generally* Albert, *The Federal and Local Regulation of Cable Television*, 48 Univ.Colo.L.Rev. 501, 508–13 (1977). The question in the present case is whether the City has gone too far under either the antitrust laws or the First Amendment in its efforts to regulate CCC's cable operations.

## A.

### Antitrust Immunity

■ To the extent the lower court grounded its order on the Sherman Act claim, it is in error. In *Boulder I*, we reversed the district court's earlier grant of an injunction because we held the City immune from antitrust liability for its action in placing a moratorium on CCC's expansion.[4] The reasoning of *Boulder I* applies

---

4. The Supreme Court has granted certiorari on this issue. *See* 450 U.S. 1039, 101 S.Ct. 1756, 68 L.Ed.2d 236 (1981).

here as well. That the geographic restriction is now a permanent one, rather than a 90-day one, does not alter the applicability of the *Parker-Midcal* doctrine discussed at length in *Boulder I*. *See* 630 F.2d at 707–08. The districting program remains a clearly expressed act of government; active supervision and enforcement is being pursued. *See California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

The district court reasoned that "actively supervised" under *Midcal, id.* at 105, 100 S.Ct. at 943, means "the City must take control of the future of cable television in Boulder in a manner which is actually *proprietary*." *Boulder II*, 496 F.Supp. at 828 (emphasis added). The district court concluded, therefore, that the City is not entitled to antitrust immunity under our reading of *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). *See Boulder I*, 630 F.2d at 708 (antitrust immunity not extended in *Lafayette* to government acting in proprietary fashion). The district court's reasoning is flawed because if active supervision is to be equated with proprietary action, governmental antitrust immunity could never exist.

## B.

### First Amendment

CCC contends that the districting ordinance violates the First Amendment in several ways. First, the ordinance is said to constitute an unlawful prior restraint on CCC's right to disseminate information because the ordinance denies CCC the right to reach two-thirds of its potential audience. Second, the ordinance is alleged to be an unconstitutional content-based restraint on expression, because it bans CCC's communications from most of Boulder so that a "better" speaker, *i. e.*, one who will offer special services such as two-way communications, may service that area. Finally, CCC claims the ordinance is not the least restrictive means for achieving whatever legitimate interests the City may have. Thus, CCC essentially argues that the City's

ordinance must be summarily declared unconstitutional because analogous prohibitions on a newspaper's right to reach even a small portion of its audience would be struck down as First Amendment violations. CCC contends that cases involving regulation of wireless broadcasters are wholly inapposite. The district court apparently accepted this view, for it stated that any differences between the freedom of newspapers and that of cable operators are not relevant to this case. *See Boulder II*, 496 F.Supp. at 829.

The City responds that (1) cable companies should not be analogized in every respect to newspapers for First Amendment purposes; (2) cable systems are natural monopolies, so that subjecting them to some reasonable regulation designed to achieve optimal use of the cable broadcasting medium does not offend the First Amendment; and (3) the districting ordinance, contemplating as it does the ultimate interconnection of all cable systems operating in Boulder, is a content-neutral regulation that promotes citizenry First Amendment interests in diverse and state-of-the-art communications services and programming, without out impeding any cable operator's ability to reach audiences, since all audiences in the City will ultimately be reachable through interconnection.

These contentions reach us in the context of requests by both CCC and the City for preliminary injunctive relief. The touchstone for obtaining such relief is a showing of irreparable harm coupled with a substantial likelihood of success on the merits. *See Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980). "There must exist a probable right and a probable danger." *Crowther v. Seaborg*, 415 F.2d 437, 439 (10th Cir. 1969). However, where irreparability exists and the balance of hardships tips in favor of a movant, the probability-of-success requirement may be somewhat relaxed: "[I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more

deliberate investigation." *Lundgrin,* 619 F.2d at 63; *see Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 758–59 (2d Cir. 1979).

 Applying these principles here, we agree with the district court that this case raises substantial, difficult, and novel First Amendment concerns. Cable operators, like publishers and wireless broadcasters, are entitled to First Amendment protection. *See Midwest Video Corp. v. FCC,* 571 F.2d 1025, 1052–57 (8th Cir. 1978), *aff'd on other grounds,* 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979); *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 43–51 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). We also agree with the district court that "[t]o the extent that First Amendment rights are infringed, irreparable injury is presumed." *Boulder II,* 496 F.Supp. at 826 (citing *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976)). But we believe that in

comparing "the competing claims of irreparable injury," *id.,* the district court failed to consider that the citizens of Boulder also have significant First Amendment interests at stake.[5] The City claims that its districting plan will advance its citizens' First Amendment interests in high quality and diverse cable communications services and programming, including two-way cable services that will enable its citizens to be disseminators of information as well as recipients.

With respect to the likelihood of success on the merits, the specific issue here is whether the City's geographic districting plan for cable operators violates the First Amendment. More broadly, the issue concerns the nature and degree of governmental regulation that the First Amendment permits over cable operators.

 At this juncture, facing as we do challenges to preliminary injunctive relief

---

**5.** The First Amendment protects not only the right to disseminate, but also the public's interest in the receipt of diversified communications. "That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public . . . ." *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945). *See National Assoc. of Theatre Owners v. FCC,* 420 F.2d 194, 207 (D.C.Cir.1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970). And the First Amendment right to receive information has been upheld in various contexts. See, *e. g., Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Procunier v. Martinez,* 416 U.S. 396, 408 09, 94 S.Ct. 1800, 1808–09, 40 L.Ed.2d 224 (1974); *Kleindienst v. Mandel,* 408 U.S. 753, 762 63, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972).

The Supreme Court has relied on the uniqueness of the wireless broadcasting medium coupled with the recognition that "[i]t is the purpose of the First Amendment to preserve an *uninhibited* marketplace of ideas . . . rather than to countenance *monopolization* of that market," and that "[i]t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount," to uphold affirmative regulation by the Government to enhance the diversity of information in broadcasting. *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969) (emphasis added). Whether comparable considerations constitutionally permit similar regu-

lation of cable has been the subject of much attention. *See, e. g.,* Note, *Midwest Video Crop [sic] v. FCC: The First Amendment Implications of Cable Television Access,* 54 Ind.L.J. 109, 116–23 (1978); Note, *FCC Regulation of Cable Television,* 54 N.Y.U.L.Rev. 204, 229–35 (1979); Note, *FCC Regulation of Cable Television Content,* 31 Rutgers L.Rev. 238, 248–58 (1978). Some commentators believe that through "structural" forms of regulation, such as mandatory access requirements and regulation limiting ownership concentration, it is possible, indeed desirable, to promote diversity in cable television while avoiding some of the objectionable aspects of broadcast regulation. *See, e. g.,* Bazelon, *The First Amendment and the "New Media"—New Directions in Regulating Telecommunications,* 31 Fed.Com.L.J. 201 (1979); Bollinger, *Freedom of the Press and Public Access: Toward a Theory of Partial Regulation of the Mass Media,* 75 Mich.L.Rev. 1, 26–37 (1976); Price, *Taming Red Lion: The First Amendment and Structural Approaches to Media Regulation,* 31 Fed.Com.L.J. 215 (1979). *See also* Lee, *Antitrust Enforcement, Freedom of the Press, and the "Open Market": The Supreme Court on the Structure and Conduct of Mass Media,* 32 Vand.L.Rev. 1249 (1979). We raise these points here to show that the First Amendment interests of cable viewers cannot be left out of the equation for permissible regulation of cable companies. *See generally Home Box Office, Inc. v. FCC,* 567 F.2d 9, 48–49 (D.C.Cir.1977).

and an incomplete factual record, we cannot dispose of all the points raised by CCC and the City.[6] We do, however, agree with the City's contention that it was inappropriate for the district court to summarily apply to cable operators the First Amendment principles governing newspapers. The nature and degree of protection afforded to First Amendment expressions in any given medium depends upon the medium's particular characteristics. For example, the degree to which the First Amendment shields the editorial discretion of wireless broadcasters differs substantially from the degree to which newspaper publishers are shielded from governmental interference. *Compare Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), *with Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). The Supreme Court has repeatedly emphasized that "[e]ach medium of expression, of course, must be assessed for First Amendment purposes by standards suited to it," *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975), for "differences in the characteristics of news media justify differences in the First Amendment standards applied to them." *Red Lion*, 395 U.S. at 386, 89 S.Ct. at 1804.

*See, e. g., Metromedia, Inc. v. City of San Diego*, —— U.S. ——, ——, ——, ——, 101 S.Ct. 2882, 2888, 2896, 2901, 69 L.Ed.2d 800 (1981); *Heffron v. International Society for Krishna Consciousness*, —— U.S. ——, ——, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981); *Schad v. Borough of Mount Ephraim*, —— U.S. ——, ——, 101 S.Ct. 2176, 2185, 68 L.Ed.2d 671 (1981).

The attributes of cable broadcasting technology indicate that the nearly absolute strictures against direct[7] governmental regulation of newspapers' dissemination of information cannot be applied in wholesale fashion to cable operators. To disseminate information, a newspaper need not use public property in the same way that a cable operator does. A newspaper may reach its audience simply through the public streets or mails, with no more disruption to the public domain than would be caused by the typical pedestrian, motorist, or user of the mails. But a cable operator must lay the means of his medium underground or string it across poles in order to deliver his message. Obviously, this manner of using the public domain entails significant disruption, especially to streets, alleys, and other public ways. Some form of permission from the

---

**6.** CCC asserts, and the district court seemingly agrees, that the districting ordinance is only one aspect of a regulatory plan that will "inexorably" lead to some regulation of programming, such as mandated reservation of some channels for public access. To the extent true, this allegation would raise a significant First Amendment issue. *See FCC v. Midwest Video Corp.*, 440 U.S. 689, 709 n.19, 99 S.Ct. 1435, 1446, n.19, 59 L.Ed.2d 692 (1979). A similar issue surrounds Ordinance 4515's language that the City may in the future require "reasonable ... interconnection with other cable systems in the City of Boulder." *See* note 1 *supra*. The City views interconnection as undercutting CCC's claim that the districting ordinance bars it from reaching a huge segment of its audience. Interconnection, the City contends, will guarantee every cable operator a city-wide audience in that a single network of cable wires will be shared by all. CCC, on the other hand, likens interconnection to coerced public access to its cable channels in that interconnection, according to CCC, will deprive one cable permit holder of the editorial discretion over whether to carry the programming of another. We, of course, intimate no view at this juncture on how these issues might be resolved, for on the present record they are not fully ripe for consideration. Nothing in the record now suggests that the City has taken any affirmative steps toward reserving channels for public access. And regarding interconnection, we do not know what form it will take, or indeed, whether it will, or even can, practically occur in Boulder. Depending on how, or if at all, these First Amendment issues ripen at trial, the district court will have an opportunity to resolve them with the benefit of a fully-developed factual record.

**7.** Nondiscriminatory application of general laws to the business aspects of publishing has been given constitutional approval, even though enforcement may have the *indirect* effect of lessening a publisher's ability to disseminate information. *See, e. g., Citizen Publishing Co. v. United States*, 394 U.S. 131, 139, 89 S.Ct. 927, 931, 22 L.Ed.2d 148 (1969) (antitrust laws); *Associated Press v. NLRB*, 301 U.S. 103, 130 31, 57 S.Ct. 650, 654 55, 81 L.Ed. 953 (1937) (labor relations laws).

government must, by necessity, precede such disruptive use of the public domain. We do not see how it could be otherwise.[8] A city needs control over the number of times its citizens must bear the inconvenience of having its streets dug up and the best times for it to occur. Thus, government and cable operators are tied in a way that government and newspapers are not.[9]

A second basis for government regulation of cable, and the one directly relied upon by the City in enacting its ordinance, is "medium scarcity." More specifically, the City asserts that there are physical and economic limitations on the number of cable systems that can practicably operate in a given geographic area. In physical terms, the City alleges a sheer limit on the number of cables that can be strung on existing telephone poles. Economically, the City argues that cable broadcasting is a monopolistic industry because it is not economically viable for more than one cable company to operate in any given geographic area. Together, the City contends, these limitations give cable companies the character of a natural monopoly and thus make the cable broadcasting medium "scarce" in much the same way that the finiteness of the electromagnetic spectrum makes wireless broadcasting a medium of essentially limited access.

▆ Inherent limitations on the number of speakers who can use a medium to communicate has been given as a primary reason why extensive regulation of wireless broadcasting is constitutionally permissible. *See Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 101, 93 S.Ct. 2080, 2085, 36 L.Ed.2d 772

(1973); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 388, 89 S.Ct. 1794, 1805, 23 L.Ed.2d 371 (1969); *National Broadcasting Co. v. United States*, 319 U.S. 190, 226, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943). When such limitations exist, and the medium requires use of a limited and valuable part of the public domain, the government must step in to allocate entry into that medium. In such circumstances, it confuses analysis to say that denying a potential disseminator the right to reach an audience is a prior restraint. No individual disseminator has the constitutional right to be the particular person who obtains the privilege to use the medium. *See Red Lion*, 395 U.S. at 389, 89 S.Ct. at 1806 (wireless broadcast "licensee has no constitutional right to be the one who holds the license").

In rejecting the notion of "medium scarcity," the district court preliminarily found that "competition on the poles" among cable operators is possible. *Boulder II*, 496 F.Supp. at 830. It is not clear whether this was a finding that no economic monopoly exists in Boulder, or whether this was only a finding that no physical law really limits the number of cables that can be laid or strung side by side. In any event, relying on *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), the district court rejected economic monopoly as justifying any degree of regulation whatsoever. In *Miami Herald*, notwithstanding contentions that the nation is dominated by one-newspaper cities and that economic conditions have made new entry into the newspaper industry virtually impossible, the Supreme Court held that a state imposed public right of access to the

---

**8.** The Federal Communications Commission has written:

"[L]ocal governments are inescapably involved in the [franchising] process because cable makes use of streets and ways and because local authorities are able to bring a special expertness to such matters ...." 37 Fed.Reg. 3276 (1972).

**9.** Unlike publishing, cable television has been and remains a highly regulated industry. *See generally* Albert, *The Federal and Local Regulation of Cable Television*, 48 Univ.Colo.L.Rev. 501 (1977); Barnett, *State, Federal, and Local*

*Regulation of Cable Television*, 47 Notre Dame Law. 685 (1972); Besen, *The Deregulation of Cable Television*, 44 Law & Contemp. Prob. 77 (1981); Williamson, *Franchise Bidding for Natural Monopolies—in General and With Respect to CATV*, Bell J. Econ. (1976); Comment, *Technology Meets Bureaucracy: The FCC's Policy for Two-Way Television*, 31 Fed.Com.L.J. 413 (1979); Note, *FCC Regulation of Cable Television*, 54 N.Y.U.L.Rev. 204 (1979); Comment, *Regulating CATV: Local Government and the Franchising Process*, 19 S.D.L.Rev. 143 (1974).

pages of a newspaper violates the First Amendment. The district court concluded from *Miami Herald* that "scarcity" within the cable broadcasting medium arising from economic conditions could in no way justify regulation of cable operators. *Boulder II,* 496 F.Supp. at 830. *Miami Herald,* however, must be read in context. The Court was writing about newspapers, a communication medium protected by a long-standing and powerful tradition that keeping government's hands off is the best way to achieve the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). Moreover, *Miami Herald* involved an effort by state government to compel public access to a medium that is not tied to government in the way cable companies necessarily are. There, the characteristic of economic scarcity was unrelated to a disruptive use of the public domain requiring a government license. The state of Florida simply felt that access to the pages of newspapers was needed to ensure presentation of all differing viewpoints within the marketplace of ideas, and relied upon notions of economic concentration within the industry to justify its control upon newspapers. It was in this context that the Court concluded "economic scarcity," without more, could not overcome the First Amendment objection against requiring a private newspaper to print what Florida's right-of-reply statute dictated.

The cable broadcasting medium presents very different circumstances.[10] As already noted, *see* note 9 *supra,* this industry has always been regulated in many respects. There is no tradition of nearly absolute freedom from government control. Most importantly, a cable company must significantly impact the public domain in order to operate; without a license, it cannot engage in cable broadcasting to disseminate infor-mation. This is exactly opposite of the situation in *Miami Herald.*

If when faced with a request for a license from a cable operator, government reasonably anticipates the kind of "medium scarcity" we have discussed, it must be permitted to deal with the effects of the scarcity that may attend the use of the license it is about to issue. That is, government must have some authority in such a context to see to it that optimum use is made of the cable medium in the public interest. In view of the lengthy franchises that cable operators seem to require, the City's districting ordinance might be justifiable as a means to avoid locking into an outmoded or less than state-of-the-art cable communications system.

The conclusion that natural monopoly is a constitutionally permissible justification for some degree of regulation of cable operators does not mean that the full panoply of principles governing the regulation of wireless broadcasters necessarily applies to cable operators. The general rationale for permitting government regulation may be the same, but the criteria upon which regulatory decisions may be made might differ. As the Supreme Court has stressed, "[e]ach method of communicating ideas is 'a law unto itself' and that law must reflect the 'differing' natures, values, abuses and dangers' of each method." *Metromedia,* —— U.S. at ——, 101 S.Ct. at 2888 (quoting *Kovacs v. Cooper,* 336 U.S. 77, 97, 69 S.Ct. 448, 458, 93 L.Ed. 513 (1949)). For example, differences in (1) the degree of natural monopoly or "scarcity" characterizing the medium, (2) the pace and potential for technological change,[11] or (3) the uses and possible uses of the medium such as two-way cable communications or even interconnection, might make kinds of regulations constitutionally permissible in one medium that would be forbidden in another. But we caution: the power to regulate is not one whit broader than the need that evokes it.

---

10. For an interesting view on partial regulation of the mass media, see Bollinger, *Freedom of the Press and Public Access: Toward a Theory of Partial Regulation of the Mass Media,* 75 Mich.L.Rev. (1976).

11. Changes in technology may also alter, over time, the scope of constitutionally permissible regulation within a particular medium.

Whether that power has been permissibly exercised by the City in this case calls for a particularized inquiry into the unique attributes of the cable broadcasting medium. The district court is best suited for such inquiry in the first instance upon a fully developed factual record.

 In sum, the significant First Amendment issues create a presumption of irreparable harm on both sides in this case and present a fair ground for litigation for both parties. Each side has moved for preliminary relief. Balancing the hardships, we cannot agree with the district court's essentially one-sided grant of preliminary injunctive relief to CCC. Rather, we believe that relief *pendente lite* must be tailored so as to minimize irreparable harm to both sides and at the same time to permit a meaningful grant of whatever permanent relief may be warranted. *Cf. Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731 (2d Cir.), *appeal after remand*, 590 F.2d 701 (1978) (extensive fashioning of preliminary injunctive relief on use of "Taylor" trademark as between Taylor Wine Company and Mr. Walter S. Taylor). *See also Tracy v. Salamack*, 572 F.2d 393, 396–97 (2d Cir. 1978); *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1347 & n.18 (2d Cir. 1974); *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1197 (2d Cir. 1971). This is best accomplished by freezing the parties in their present circumstances until trial on the merits, *see* note 2 and accompanying text *supra*, rather than either by allowing CCC to continue its expansion in complete derogation of Ordinance No. 4515, or by permitting the City to strictly enforce the boundaries of its ordinance, which would leave the City free to grant exclusive cable franchises outside those boundaries.

Taking into consideration the concepts we have outlined in this opinion, the task for the district court at trial is to determine, upon final fact findings, whether cable's unique attributes warrant, in First Amendment terms, the nature and extent of regulation the City seeks to impose on cable companies in Boulder. In so doing, the district judge must fashion the First Amendment standards to be applied to this new medium under the circumstances of this case.

Reversed and remanded for trial on the merits.